UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTHONY W. OLIPHANT,<br>*Plaintiff*, | Civil No. 3:09cv862 (JBA) |
| *v.* | |
| ROBERT VILLANO, *ET AL.*,<br>*Defendants*. | August 31, 2012 |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Anthony Wayne Oliphant filed suit against Defendant Officers Sheppard, Onofrio, Villano, Ronald Glifort, Eric Goclowski, Michael Nawrocki, Robert O'Neil, Jason Venditto, Lieutenant Michael McNeil, and Sergeant Michael Sigmon ("Hamden Defendants"); Officers Levy, Howze, and Smith ("New Haven Defendants"); and Rhonda Dixon, Deedra Dixon, Marc Dixon, Anthony Dixon, Timothy Dixon ("Dixon Defendants")[1] alleging excessive force against Officers Sheppard and Onofio (Count One), false imprisonment and excessive force against Officer Villano (Count Two), failure to intervene against Lieutenant McNeil, Sergeant Sigmon, and Officers Glifort, Goclowski, Nawrocki, O'Neil, and Venditto (Count Three), unlawful seizure and deprivation of procedural due process against Officers Villano, Levy, Howze, Smith, Sheppard, and Onofrio (Count Four), assault against the Dixon Defendants and Officer Villano (Count Five), and intentional infliction of emotional distress ("IIED") against the Dixon Defendants and Officers Villano, Sheppard, and Onofrio (Count Six).[2]

---

[1] To date, the Dixon defendants have not been served despite efforts by the U.S. Marshal.

[2] In his Opposition Memorandum as to the Hamden Defendants' motion, Mr. Oliphant voluntarily withdraws his pending claims against Officers Glifort, Goclowski, and

The New Haven Defendants—Officers Levy, Howze, and Smith (now deceased)—move [Doc. # 189] for summary judgment as to Count Four. The Hamden Defendants—Villano, Sheppard, Onofrio, Mawrocki, Venditto, Sigmon, and McNeil—collectively move [Doc. # 196] for partial summary judgment on all claims against Villano (i.e., Counts Two, Four, Five, Six), Count Three, and Count Four.[3]

For the reasons that follow, the New Haven Defendants' motion for summary judgment will be granted, and the Hamden Defendants' motion will be granted in part and denied in part.

I.      Factual Background

The extended circumstances from which this case arises started with a domestic dispute between Plaintiff and his ex–girlfriend Rhonda Dixon, reported on September 25, 2006 as an assault which Officer Villano and the other Hamden Defendants investigated. At that time, Mr. Oliphant lived at 130 Cherry Ann Street #3, New Haven, Connecticut, in one unit of a four–unit building owned by his sister, Ms. Vorcelia Oliphant. Officer Villano was dispatched to the Ebony Lounge in Hamden, Connecticut to investigate this reported assault. (*See* Affidavit of Robert Villano, Ex. A to Hamden Defs' 56(a)1 Stmt ¶ 5; *see also* Hamden PD Incident Report 9/26/2006, Ex. B to *id.* at 1.) He spoke with Ms. Dixon, who stated that she had been assaulted by her boyfriend, Anthony Oliphant, at his apartment at 130 Cherry Ann Street, and Officer Villano observed that Ms. Dixon had "extreme swelling to [her] right eye and blood under her eyelid. (Villano Aff. ¶¶ 6–7.)

---

O'Neil.

[3] Hamden Defendants' motion does not address Counts One and Six against William Onofrio and Mark Sheppard.

Officer Villano attests that Cherry Ann Street was "located in the area [he] was assigned to" that evening, and thus, it was determined that this would be his case. (*Id.* ¶ 9.) Mr. Oliphant disputes Villano's jurisdiction, because Cherry Ann Street is located in New Haven, not Hamden. (Pl.'s Loc. R. 56(a)2 Stmt [Doc. # 205–1] ¶ 7.) Ms. Dixon accompanied Officer Villano to 130 Cherry Ann Street; Sergeant Sigmon and Officer Venditto also responded. (*Id.* ¶¶ 10–12.) Mr. Oliphant states that Ms. Dixon was also accompanied by her sister Deedra and her three brothers. (Pl.'s Aff., Ex. 1 to Pl.'s Loc. 56(a)2 Stmt ¶ 19.) As Defendants Villano, Venditto, and Sigmon approached Plaintiff's apartment building, in which Ms. Dixon reported that Plaintiff lived in an apartment with two floors, a black male who they learned was Plaintiff stuck his head out of an upstairs window and started yelling at Ms. Dixon and calling her a "f [. . . ] g bitch," and that he was "f [. . .]g done with her." (*See* Villano Aff. ¶ 13; Venditto Aff. ¶ 13; Sigmon Aff. ¶ 11.)

Officer Villano asked Mr. Oliphant to come outside to tell his "side of the story," but Mr. Oliphant refused, telling the officers to go get a "f[. . . ] g warrant." (Villano Aff. ¶ 17.) Officers Villano, Venditto, and Sergeant Sigmon eventually left. (Ex. A ¶ 20; Ex. D ¶ 18; Ex. E ¶ 15.) Oliphant asked the Dixons to leave. (Pl.'s Dec., Ex. 1 to Pl.'s 56(a)2 Stmt ¶ 22.) Ms. Dixon went to Yale–New Haven Hospital, where she was examined and where Officer Villano took her statement. (Ex. B to Def.'s 56(a)1 Stmt at 2.)

On the morning of September 25, Plaintiff called the Hamden Police Department to complain about Officer Villano and "two unknown officers." (Pl.'s Aff. ¶¶ 32–34.) When he could not find his house keys, he feared that Ms. Dixon had taken them, so he changed the locks on the front and back doors of his apartment. (*Id.* ¶¶ 35–36.)

On September 26, 2006, during his midnight shift, Officer Villano returned to Mr. Oliphant's apartment to speak with him (Villano Aff. ¶ 23), accompanied by Lieutenant McNeil, Officers Venditto, and Nawrocki. Officer Venditto was "handling a large dog" at the time (Pl.'s Aff. ¶ 38). Plaintiff saw Officer Villano trying to open his back door with his own missing key ring. (*Id.* ¶¶ 40–41). When Officer Villano failed to get the door open, he "aggressively kick[ed] [the] back door several times" (*id.* ¶ 42), as witnessed by Plaintiff's neighbor, Ms. Cathy Williams (*see* Tr. of Violation of Probation Hr'g, Ex. 3 to Pl.'s 56(a)2 Stmt at 51:13–26). Ms. Jacquiline Nieves, another neighbor, also testified that she heard someone "screaming and banging" on Plaintiff's back door. (Ex. 4 to Pl.'s 56(a)2 Stmt at 188:4–10.)

Officer Villano states that he knocked on the rear door of 130 Cherry Ann Street, the main entrance to Plaintiff's apartment, and announced the police presence (*id.* ¶ 24), in response to which Plaintiff stuck his head out of a second floor window. Villano asked him to come outside and give a statement regarding the incident with Ms. Dixon (*id.* ¶ 29), and Plaintiff "immediately began screaming obscenities" at the officers (*see id.* ¶ 27; Venditto Aff. ¶¶ 21–22; *see also* McNeil Aff., Ex. F to Def.'s 56(a)1 Stmt ¶¶ 7–8; Nawrocki Aff., Ex. G to Def.'s 56(a)1 Stmt ¶¶ 7–8). The officers left an estimated fifteen minutes later, once they realized that Mr. Oliphant was not going to speak with them. (Villano Aff. ¶ 28.)

The following night, Villano again returned to Mr. Oliphant's apartment building around 11:30PM. (*Id.* ¶ 29.) When he arrived, Ms. Dixon and her family were also there. (*Id.*) Plaintiff attests that the Dixons "loudly and aggressively threatened to physically attack and kill me." (Pl.'s July 5 Aff. ¶ 8.) Officer Villano states that he saw Plaintiff leaning out of his second floor window "screaming obscenities at the group." (*Id.* ¶ 30.)

4

Plaintiff states that "the Dixons unsuccessfully attempted to break open my front door and loudly and aggressively threatened to physically attack and kill me." (Pl.'s Aff. ¶ 8.) Based on these threats, and "fearing for [his] safety," Plaintiff called 911. (*Id.* ¶ 10.) New Haven Officers Howze, Levy, and Smith were dispatched to 130 Cherry Ann Street.[4] (Levy Affidavit, Ex. 2 to New Haven Def.'s 56(a)1 Stmt [Doc. # 190] ¶ 6.)

Plaintiff states that then his car was "taken away without [his] consent" (*id.* ¶ 14), and that "[d]espite my complaints, Officers Villano, Levy, Howze, and Smith allowed the taking of my car" (*id.* ¶ 15), but Officers Howze and Levy did not "participate in having a motor vehicle towed from that address." (Levy Aff. ¶ 7.) The Case Incident Report that Officer Levy prepared makes no mention of a motor vehicle being towed. (*Id.* ¶ 8.)

In November 2006, in Plaintiff's small claims action against Ms. Dixon for "illegal confiscation and conversion, 9/27/06, of plaintiff's car . . . 1989 Bonneville—L.E." (Oliphant v. Dixon, SCANH–17932, Ex. 2 to Pl.'s 56(a)2 Stmt), Ms. Dixon's answer stated:

> Anthony Oliphant did purchase car for $400, but from my brother, Tim Dixon. Car was registered and insured in my name . . . Both Anthony and I had use of vehicle. I terminated use of vehicle and took the vehicle after he attacked me, this action was ok'd by the hamden police officer that was on site, said I had that right. If I owe anything it would be cost of vehicle.

(Ex. 2 to Pl.'s 56(a)2 Stmt.)

On October 5, 2006, Plaintiff filed a Citizen Report with the Hamden Police Department against Officer Villano and two unknown officers, alleging that Officer Villano

---

[4] It appears that there was confusion on the part of the 911 dispatchers as to whether 130 Cherry Ann Street was a New Haven or Hamden address, since both municipalities' officers were informed, respectively, that 130 Cherry Ann Street was within their covered territory. (*See* Villano Aff. ¶¶ 16, 29.)

5

had "illegally ordered" him to come out of his home, kicked and banged on his back door and "illegally assisted" in the wrongful towing of his car. (Citizen Complaint, Ex. M.) The responding Hamden Police Lieutenant observed no visible damage to Mr. Oliphant's rear door (*see* Nov. 22, 2006 Memo from Lt. McDermott to Chief Wydra, Ex. O), and the Hamden PD Ethics and Integrity Unit found Mr. Oliphant's allegations of misconduct "not sustained" (*see* Nov. 22, 2006 Letter from McDermott to Oliphant, Ex. P).

An arrest warrant which Officer Villano applied for, charging Plaintiff with Assault in the Second Degree, Breach of Peace, Interfering with an Officer, and Disorderly Conduct (Villano Aff. ¶¶ 38–39), was signed by a superior court judge on September 28, 2006 (*see* Arrest Warrant, Ex. C to Def.'s 56(a)1 Stmt). Mr. Oliphant was arrested by the Hamden Police Department on October 6, 2006 for "Assault on a Police Officer." (*See* October 6, 2006 Case Incident Report, Ex. Q.) Officer Sheppard's Case Incident Report states Officer Villano had advised him that:

> he had been attempting to apprehend Mr. Anthony Oliphant . . . for the past several days based on a domestic dispute that Ofc. Villano had responded to and investigated. Ofc. Villano advised that he had applied for an arrest warrant for Mr. Oliphant and that the warrant had been granted. Mr. Oliphant had been charged with Assault in the Third Degree, 53a-61, Breach of Peace in the Second Degree, 53a-181, Disorderly Conduct, 53a-182, and Interfering/Resisting, 53a-167a. . . . Ofc. Villano stated that Mr. Oliphant knew that officers had been looking for him and he had been eluding them and taunting them from inside his home.

(Ex. Q at 2.) Officer Sheppard's report regarding Plaintiff's arrest in his car states:

> This officer yelled "police" and advised Mr. Oliphant of the warrant for his arrest. Mr. Oliphant immediately stated, "f[. . .] you, I'm on my own private property, get lost." This officer yelled for Mr. Oliphant to shut the vehicle off and throw the keys out of the window. Mr. Oliphant stated, "f[. . .] you," and reached towards his waistband area with his right hand. This officer could

not see what Mr. Oliphant was reaching for and feared that it might be a weapon based on his aggressive verbal responses to this officer. This officer feared for his life at this time and withdrew a department issued firearm and pointed it at Mr. Oliphant and yelled for him to keep his hands on the steering wheel. Mr. Oliphant stated, "you won't shoot me asshole," and quickly pulled an object out of his waistband area. . . . [T]his officer recognized the object in [his] hand as a cell phone. This officer relaxed the grip on the trigger of the firearm and again yelled for Mr. Oliphant to place his hands on the steering wheel. . . . There were power windows in the vehicle and Mr. Oliphant then brought up the passenger side window and put the vehicle in reverse and backed it up several feet onto the grass.

(*Id.* at 3.) Officer Sheppard broke the passenger side window with the rear end of his baton, reholstered his gun, and reached for his taser. (*Id.*) Officer Onofrio, who had been dispatched, then pulled open the driver's side door while Sheppard "covered" Oliphant with his taser. (*Id.*) Sheppard states that he and Onofrio attempted to handcuff Plaintiff, but that Mr. Oliphant resisted. He was tasered, but broke free from the officers and swung at Officer Onofrio, hitting his ear. (*Id.*) The officers then used an air cartridge to shoot a taser at Plaintiff, who ran away from them and "picked up a large loose tree branch, that was later determined to be 53.5" in length and 1.75" in width." (*Id.*)

Eventually, four officers got both handcuffs on Plaintiff. (*Id.* at 4.) Sheppard, Onofrio, and Plaintiff received medical attention after the incident. (*Id.*)[5] On March 17, 2008, all pending criminal charges against Plaintiff with respect to the events of September 24–27 and October 6, 2006 were dismissed.

---

[5] The Hamden PD Officer Stephen Baris, who is not a party to this action, completed a Connecticut DMV H–114 form that day documenting the towing of a Ford Taurus from 130 Cherry Ann Street because the passenger side window was broken. (*See* Notice of Motor Vehicle Tow, H–114 Form, Ex. S to Def.'s 56(a)1 Stmt.)

II.     Discussion[6]

    A.     Fourth Amendment Violations

        1.     Officer Villano (Count Two: False Imprisonment)

Defendant Villano moves for summary judgment as to Count Two, arguing that because there was no physical contact between him and Plaintiff, and because he never took Plaintiff into custody, he is entitled to judgment as a matter of law. At oral argument, Plaintiff's counsel clarified that Count Two was not alleging a violation of the Fourth Amendment under a theory of excessive force against Plaintiff's person, but rather a Fourth Amendment claim that Plaintiff was unlawfully seized by Officer Villano, under the same facts giving rise to Plaintiff's claim of false imprisonment.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotation marks omitted). The Supreme Court has held that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would not have believed he was free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of

---

[6] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000).

circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin*, 551 U.S. at 254. Defendant asserts that because Plaintiff did not submit to Officer Villano's display of authority, there was no seizure.

Plaintiff argues that a reasonable jury could conclude that a reasonable person in Oliphant's position would not have felt "free to leave." Indeed, the record shows that there were "several" police officers on the premises, with a dog, and Plaintiff states that he was afraid and felt threatened by them. However, Oliphant was never "held" anywhere by Officer Villano, and in fact, Oliphant defiantly and repeatedly refused to come into the presence of and speak with the officers. No jury would have sufficient evidence to conclude that he submitted to Officer Villano's authority, and was "seized" within the meaning of the Fourth Amendment. *See Califonia v. Hardari D.*, 499 U.S. 621, 629 (1991) ("[A]ssuming that [the Officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled."); *see also Mendenhall*, 446 U.S. at 544. ("As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.").

Accordingly, as the record does not show that Mr. Oliphant submitted to any show of authority by Officer Villano, Officer Villano's motion for summary judgment as to the claim of Fourth Amendment violation in Count Two will be granted.

        2.      Lieutenant McNeil, Sergeant Sigmon, Officers Nawrocki and Venditto (Count Three: Failure To Intervene)

"A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (defendant officer "can be found liable for deliberately choosing not to make a reasonable attempt to stop" the use of excessive force by another officer with respect to abuse that he had a "realistic opportunity" to stop).

As concluded in the previous section, Officer Villano did not commit an unlawful seizure in violation of the Fourth Amendment, as there was no submission by Plaintiff and thus there was no unconstitutional activity that these Defendants could be liable for failing to prevent. Accordingly, Defendants McNeil, Sigmon, Nawrocki, and Venditto's motion for summary judgment is granted as to Count Three.

        B.      Fourteenth Amendment Violations Alleged Against Villano, Levy, Howze, Smith, Sheppard, and Onofrio (Count Four: Unlawful Seizure and Deprivation of Procedural Due Process)

To prevail on a procedural due process claim, a plaintiff must show a deprivation of a constitutionally protected property or liberty interest. *Narumanchi v. Bd of Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988). Plaintiff claims two separate deprivations: the removal of his Bonneville on September 27, 2006, and the towing of his rental Ford on October 6, 2006.

10

The Hamden Defendants' argument that Plaintiff cannot establish that he had a "legitimate claim of entitlement" to his cars (the Bonneville and the Ford Escort) is without merit. Plaintiff has put forth evidence that he purchased the Bonneville from Ms. Dixon for $400. (*See* Dixon Ans.) Further, both the Bonneville and the rental car were lawfully in Plaintiff's possession when taken, and "an individual has an important interest in the possession of his or her motor vehicle." *Krimstock v. Kelly*, 306 F.3d 40, 61 (2d Cir. 2002). "Property interests are created, and their dimensions defined, by state law," *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1201 (2d Cir. 1987) (citing *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)), and Connecticut courts have held that possession of real or personal property "raises a rebuttable presumption of ownership." *Hall v. Schoenwetter*, 239 Conn. 553, 560 (1996). Thus, a reasonable jury could conclude that Plaintiff had a legitimate claim of entitlement to both of his vehicles, giving rise to Fourteenth–Amendment protections.

The greater challenge for Plaintiff is showing that Defendants were personally involved in the claimed deprivations of property. As to the Bonneville, the record is undisputed that neither the Hamden Defendants nor the New Haven Defendants directly assisted or actively participated in the removal of his vehicle. Ms. Dixon clearly stated that it was she who had the Bonneville removed. (Dixon Ans., Ex. R to Hamden Def.'s 56(a)1 Stmt.) However, even without direct personal involvement, the Second Circuit has found that a defendant may be "personally involved" in a constitutional deprivation in "several ways," *see Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986), including where "state officials communicate to a private person that he or she will not be arrested, punished, or

otherwise interfered with while engaging in misconduct that is likely to endanger the . . . property of others." *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005).

Plaintiff contends that the record shows that New Haven Defendants knew that Plaintiff's car was being taken, and they allowed it to happen. However, there is no record support for the claim that the New Haven Defendants implicitly or explicitly encouraged Ms. Dixon to deprive Mr. Oliphant of a property right in violation of the Constitution. In fact, Ms. Dixon reported that "this action was ok'd by the [H]amden police officer that was on site." (Dixon Ans., Ex. 2 to Pl.'s 56(a)1 Stmt.) Thus, there is insufficient evidence in the record from which a juror could reasonably conclude that New Haven Defendants Smith, Howze, and Levy allowed Ms. Dixon to remove the vehicle, after Officer Villano gave her permission to do so, amounting to a constitutional violation. The record is similarly devoid of evidence that could permit a juror to properly conclude that Officer Villano's conduct in permitting Ms. Dixon to take the car that she said was registered and insured in her name amounted to "implicitly but affirmatively condoning" the unconstitutional removal of Plaintiff's vehicle, even if she and Plaintiff shared its use. *Okin v. Village of Cornwall–On–Hudson Police Dept.*, 577 F.3d 415, 429 (2d Cir. 2009).

As to the rental car that was towed by the Hamden Police Department, Officer Stephen Baris towed the Ford Taurus and filled out a H–114 form documenting the tow. Officer Baris is not a defendant in this action, and Plaintiff makes no argument as to Officers Shepard or Onofrio's involvement or assistance in the removal of the rental car by Officer Baris.

Thus, Officer Villano's motion and the New Haven Defendants' motion for summary judgment will be granted on Count Four, as to both vehicles.

12

C.      State Law Claims

   *1.      False Imprisonment and Trespass To Chattels (Count Two: Villano)*

In addition to his constitutional claim in Count Two, Plaintiff claims false imprisonment and trespass to chattels against Officer Villano for kicking his door and yelling at him. "False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Green v. Donroe*, 186 Conn. 265, 267 (1982); *see also Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir.2007). "To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Lo Sacco v. Young*, 20 Conn. App. 6, 19, *cert. denied*, 213 Conn. 808, 568 A.2d 793 (1989). Mr. Oliphant may not have wanted to go outside that evening, but there is nothing in the record that would support Plaintiff's claim that he was physically restrained by Officer Villano. Plaintiff attests that he was "frightened and upset by the unexpected presence of five Hamden Police officers and their large dog in [his] back yard in the middle of the night, and by the aggressive conduct of Officer Villano" (Pl.'s Aff. ¶ 44), but even viewing the record in the light most favorable to Plaintiff, no reasonable jury could conclude that his physical liberty was unlawfully restrained by Officer Villano the evening of September 26, 2006; rather, Plaintiff simply did not want to go out and speak with Officer Villano, and refused to do so, as evidenced by Villano's affidavit, and well as the affidavits of the other Hamden Defendants, stating that Plaintiff was "screaming obscenities" at them and refused to speak with them. (*See* Villano Aff. ¶ 27 ("I asked Mr. Oliphant to come outside and give a statement regarding the incident with Ms. Dixon the night before but he immediately began screaming obscenities at me and the other officers on the scene.");

13

*see also* Venditto Aff. ¶ 21 ("After Officer Villano knocked Mr. Oliphant came to the second floor window and began berating Officer Villano and refusing to cooperate with the investigation."); Sigmon Aff. ¶ 18; McNeil Aff. ¶ 7; Nawrocki Aff. ¶ 7.) Thus, Villano is entitled to summary judgment on the claim of false imprisonment.

Trespass to chattels is defined as "intentionally: (a) dispossessing another of the chattel; or (b) using or intermeddling with a chattel in the possession of another." *Simms v. Chaisson*, 277 Conn. 319, 331 (2006). Count Two of Plaintiff's Amended Complaint makes no mention of Plaintiff being "dispossessed" of personal property by Defendant Villano; further, even if Officer Villano kicked Plaintiff's door which caused damage to the doorframe, the doorframe is not a "chattel" within the meaning of the common law, as it is a fixture on real property. *See ATC Partnership v. Town of Windham*, 268 Conn. 463, 487 (2004) (distinguishing between fixtures and chattels and noting that "[f]ixtures, *a legal part of the realty without the independent character of 'goods or chattels,'* are not included within the scope of [Connecticut's] replevin statute.") (emphasis added); *see also New York Life Ins. Co. v. Allison*, 107. F. 179, 185–86 (2d Cir. 1901) (looking to the removability of an annexation in order to determine whether it is sufficiently affixed to the property so as to become a fixture). Thus, Villano is entitled to summary judgment on Plaintiff's trespass to chattels claim.

### 1.    Conversion (Count Four: Villano, Levy, Howze, Sheppard, Onofrio)

Plaintiff has also asserted a claim for the common law tort of conversion against the Hamden and New Haven Defendants who he contends "caused" his Bonneville and his rental car "to be removed from the private driveway behind his home." (Am. Compl. ¶¶ 120–21.) "Conversion is the unauthorized assumption and exercise of the right of

ownership that interferes and harms the owner's rights to that property." *Yeomans v. Wallace*, 291 F. Supp. 2d 70, 76 (D. Conn. 2003). "Therefore, at a minimum, the plaintiff must allege that the defendants . . . have taken the plaintiff's property and retained possession of those items, treating them as their own." *Id.* There are no such allegations in the Amended Complaint, there is no evidence proffered by Plaintiff of such conduct, and Defendants are entitled to summary judgment on the conversion claim in Count Four.

## 2.    Assault (Count Five: Dixons and Villano)

Defendant Villano also moves for summary judgment as to Plaintiff's assault claim against him. Civil assault is "the intentional causing of imminent apprehension or harmful or offensive contact in another." *Dewitt v. John Hancock Mutual Life Ins. Co.*, 5 Conn. App. 590, 594 (Conn. App. Ct. 1985); *Simms v. Chaisson*, 277 Conn. 319, 331 (Conn. 2006). The Second Restatement of Torts explains that "[i]n order to become liable under the rule stated in this Section, it is necessary that the actor intend to inflict a harmful or offensive bodily contact upon the other or a third person or put him in apprehension of such contact." Restatement (Second) of Torts § 21, Cmt. f. While Connecticut courts have stated that "no actual contact is required" to accomplish an assault, *see Normal v. Distasio*, No. CV96039982S, 2001 WL 761135, at *3 (Conn. Super. Ct. June 15, 2001) (quoting Douglass B. Wright, et al., *Connecticut Law of Torts*, § 6, at 8 (3d ed.1991)), "an overt act evidencing some corporeal threat is required to transform mere words into an assault." *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 647 (D. Conn. 2005) (denying summary judgment on assault claim where Plaintiff alleged that "Mr. Mahoney berated her for allegedly bouncing a company check, warning her that '[n]obody F's with me . . . and gets away with it,' and

while 'yelling at [her] and spitting at [her]' he moved within 'just a couple inches from [her] face.'").

Here, viewing the record in the light most favorable to Plaintiff, a reasonable jury could conclude that Officer Villano intended, by repeatedly kicking Plaintiff's door, to put Plaintiff in "imminent apprehension" of a harmful or offensive contact if he successfully kicked the door in and came after Plaintiff. Accordingly, Officer Villano's motion for summary judgment as to Count Five will be denied.

       3.      *Intentional Infliction of Emotional Distress (Count Six: Dixons, Villano, Sheppard, and Onofrio)*

 Plaintiff has also asserted claims of IIED, or in the alternative, negligent infliction of emotional distress, against Defendants Villano, Sheppard, and Onofrio, which Defendants contend are unsupported by the record.

For this tort, a plaintiff must establish:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; 2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury.

*Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 526–27 (2012) (quoting *Appleton v. Bd of Educ.*, 254 Conn. 205, 210–11 (2000)).

As to Officer Villano, although he never had physical contact with Plaintiff, the record reflects that he came to Plaintiff's home late at night three nights in a row before any arrest warrant was issued, came with a police dog and other officers, and permitted the

16

Dixons—a rowdy group that was angry and threatened Mr. Oliphant—to stand on the front lawn and yell at Plaintiff. Plaintiff attests that he saw Officer Villano attempt to open his door with Plaintiff's own set of keys (Pl.'s Aff. ¶¶ 40–41), and that Officer Villano "yell[ed] accusations about [him] and yell[ed] threats and insults at [him]," and "aggressively kick[ed] [his] back door several times" (*id.* ¶ 42), enough to damage his doorframe. This conduct by a police officer, if proved, could be found to go beyond conduct "usually tolerated by decent society," *Appleton*, 254 Conn. at 210–11, and is distinguishable from mere threats of arrest, which do not rise to the level of extreme and outrageous conduct. *See, e.g.*, *Winter v. Northrop*, 3:06cv216(PCD), 2008 WL 410428, *7 (D. Conn. Feb. 12, 2008) (Woodbury Constable Howard Northrop's actions, "yell[ing] and scream[ing] at Plaintiff over the phone, threatening him with arrest," did not go beyond all possible bounds of decency). Therefore, Officer Villano's motion as to Count Six is denied.

Officers Sheppard and Onofrio are similarly not entitled to summary judgment on Plaintiff's IIED claim against them. Plaintiff attests that on October 6, 2006, he was "ambushed in [his] backyard by Officers Sheppard and Onofrio . . . and was handcuffed, tasered, beat up, and then taken to the hospital." (Pl.'s Aff. ¶ 58.) Accepting Plaintiff's version of the officers' actions, as required for summary judgment motions, a reasonable juror could conclude that the officers' conduct was extreme and outrageous, and Defendants Onofrio and Sheppard's motion as to Count Six is also denied.

17

III.    Conclusion

For the reasons discussed above, the New Haven Defendants' motion [Doc. # 189] for summary judgment is GRANTED. The Hamden Defendants' motion [Doc. # 196] for summary judgment is GRANTED in part and DENIED in part. Specifically, Hamden Defendants' motion is DENIED in part as to Count Two—Plaintiff's false imprisonment claim remains for adjudication, while Plaintiff's Fourth Amendment and trespass to chattels claims are dismissed—and it is GRANTED as to Counts Three and Four and DENIED as to Counts Five and Six. New Haven Defendants Howze, Smith, and Levy are dismissed from the case, as are Hamden Defendants McNeil, Sigmon, Nawrocki, and Venditto.

IT IS SO ORDERED.

                            /s/
                            Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of August, 2012.